**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISRICT OF MARYLAND**
**(Southern Division, Greenbelt)**



LISA MAGNAS
3 Saddlerock Court
Silver Spring, MD, 20902
917 513-8398
meshugas2016@gmail.com

Civil Case # PWG 20 CV 2862
Non-Jury Trial

                   *

        Plaintiff,

Vs.

                   *

DANIEL PERLMAN
300 Winston Drive
Apartment 303
Cliffside Park, NJ 07010            *
201 658-4132
danperl121283@gmail.com

        Defendant.

                   *

## COMPLAINT

Plaintiff, Lisa Magnas, by and through undersigned counsel, sues defendant, Daniel Perlman, and in support thereof states the following.

## STATEMENT OF THE PARTIES

1. Plaintiff is a citizen and resident of the State of Maryland, Montgomery County.

2. The parties were never married and never lived together, but carried-on a relationship starting 2/2007 which started to sour when the plaintiff found-out defendant had lied to her about still living in New Jersey with his ex-wife and their

1

daughter and worsened when plaintiff became pregnant and defendant began to belittle her and failed to assist her when she went into labor.

3. After the birth of the child in 2008, the defendant's harassment increased in intensity.

4. Plaintiff decided to move away from defendant's presence – and, thus, away from New York, essentially leaving behind many avenues of her professional career - in favor of her familial home in Montgomery County, Maryland and of part-time jobs, contract work, and of expected cessation of harassment.

5. There was an attempted reconciliation in November 2008, which proved unsuccessful.

6. Plaintiff is a private person of the Orthodox Jewish faith.

7. Defendant is a citizen and resident of the State of New Jersey, who describes himself as Jewish *"but not* Orthodox."

8. Defendant has not worked since he lost his job as a customer service rep at Barnes and Nobel more than six years ago.

9. As a result of their relationship the parties have minor children who were born approximately a year apart, a single-birth boy (2008) and a set of boy-twins (2009).

10. Defendant never lived with any of the children and he has spent less than 10 overnight visits alone with them since their births.

11. At the time of birth of the single son, the infant's pediatrician warned the plaintiff that the defendant was a danger to the baby and stated she would inform Child Protective Services of that fact; the pediatrician's warning and the possibility that

Child Protective Services would intervene to protect the baby from the defendant were strong factors in plaintiff's move away from proximity with the defendant.

12. At the time of the twin-pregnancy, the defendant put extreme pressure on the plaintiff and aggressively demanded that she abort the twins[1] but the plaintiff wanted the babies to be born and to live.   Defendant's repeated demands to abort the twins caused the plaintiff great emotional distress and marked the emotional termination-point of their relationship.

13. Forty-eight hours after the twin-birth, in 2009, while the infants remained in intensive care, the defendant became exceedingly vengeful and demeaning of the plaintiff, haranguing her and causing her great and long-lasting pain. This was the end of their relationship.

14. After their relationship ended, the defendant began a program of harassment of the plaintiff, and has obsessively and relentlessly hunted, defamed, stalked and harassed the plaintiff – directly and by harassing her family members and her community – ever since then.

15. Without plaintiff's permission or knowledge, and with the intent to cause harm to the plaintiff, defendant had filmed her while she was giving birth to one of the twins and subsequently posted the video on-line.[2]

---

[1] Defendant demanded that the twin-pregnancy be "reduced," a euphemism for aborting one of them, called "selective reduction," a procedure which medical opinion stated would have, in fact, aborted *both* twins, since they were monochorionic.  Plaintiff's failure to adhere to his demand to abort one of the twins sparked anger in the defendant.

[2] The defendant has never shown this video to the plaintiff and she is left to wonder to what extent her intimate parts were depicted.  In addition, she doesn't know to what extent she is recognizable in the video.  These facts cause her great and continuing consternation and humiliation.  Defendant informed plaintiff of the existence, preservation and posting of this video while in open-court at parties' trial on the merits of the custody case (4/13/2015).

16. Just prior to the twin-birth, plaintiff sent defendant an email referring to the one-year-old boy who was starting to be potty-trained.  Plaintiff expected the defendant to be delighted by her message.  But instead, after the twins were born – and not aborted - the defendant used the email against the plaintiff.  He misconstrued it to be sexually abusive and sent it (along with his misconstrued description of it) to people who knew the plaintiff in a professional capacity as evidence that plaintiff is sexually abusive.

17. On 7/24/2014, the defendant herein instituted a *pro se* custody case in Montgomery County Maryland (FL #121283) and uses that case as a pretext for harassing the plaintiff rather than to benefit from asserted legal rights.

## STATEMENT OF JURISDICTION AND VENUE

18. Federal diversity jurisdiction exists pursuant to 28 U.S.C. §1332.

19. The amount in controversy, exclusive of interest and costs, exceeds the sum or value of Seventy-Five Thousand Dollars and Zero Cents ($75,000.00), meeting the requirements of 28 U.S.C. 1332(c)(1).

20. The facts and the torts, which are the basis of this lawsuit, occurred primarily within Montgomery County, Maryland and venue is proper in this court.

## COUNT ONE:  SECOND DEGREE ASSAULT
## AND
## DOMESTIC VIOLENCE IN PRESENCE OF MINOR CHILDREN

21. Plaintiff adopts and incorporates by reference each and every preceding paragraph as if it were fully set forth here and alleges the following additionally or in the alternative.

22. On October 4, 2017, the defendant committed a violent assault against the plaintiff by attempting to run her over with a car.

23. Defendant placed the plaintiff in reasonable fear of an imminent battery and reasonable fear of being run-over and seriously injured or killed by defendant.

24. With the intent of assaulting, injuring, harassing and intimidating plaintiff, the defendant drove across state lines from New Jersey to Maryland with the intent to harass, injure, and intimidate the plaintiff.

25. In the commission of the assault, defendant drove a car that plaintiff wouldn't recognize and used that car as a dangerous weapon against the plaintiff.

26. The defendant did in fact assault in the plaintiff in the second degree and caused her reasonable fear of death or serious bodily injury.

27. The defendant's assault caused the plaintiff substantial, emotional distress.

28. In the commission of the assault, defendant manipulated the plaintiff's religious observance to work against her by using the October 4, 2017 child-visitation exchange to assault her, when he knew she would be most vulnerable:  during a Jewish holiday observance.

29. The defendant's visitation schedule was court-set for 4:00PM that afternoon until 4:00 PM the next day, October 5, 2017.  But, instead of exercising his full visitation, the defendant set-up the return of the children to occur at 10:00 PM that night.  The location was a dark, secluded, and deserted parking lot on the Jewish holiday of Sukkot, when defendant knew nobody would be around to witness his acts nor to assist the plaintiff and that, because plaintiff's religious observance

prohibited her from driving, she would be unable to meet him from the relative protection of a vehicle, but would be on foot and unprotected.

30. The defendant knew the area, adjacent to an Orthodox synagogue and, by information and belief, he obtained aerial views of the parking lot and its surroundings; he knew that no stores or businesses would be open and nobody would be remaining at the synagogue at that time of night.  He knew no houses are directly adjacent to the parking lot; the parking lot is not in view of the street and the line-of-sight from the street is blocked by a Montgomery County Park, which closes at dark.

31. That night, due to her religious observance, the plaintiff walked the 1.4 miles  from her home to the parking lot to pick-up her children from their five-hour visit with the defendant and plaintiff was accompanied in the walk by her elderly mother.

32.  When plaintiff got to the parking lot, she didn't see the defendant or the children, but a while later, she saw headlights approaching her from the far-end of the parking lot.

33. The defendant arrived early and situated the car at the far end of the parking lot – away from the parking lot entrance from where plaintiff would approach on foot.

34. The parking lot seemed empty to the plaintiff; she didn't know defendant was already there and suddenly some strange car came speeding up directly at her.

35. Defendant drove the car across the unlit parking lot toward the plaintiff and tried to run her over by speeding up as his car approached her and by driving right up the curb of the sidewalk in front of her - with his headlights shining in her eyes –

then suddenly, he slammed on the brakes just short of hitting her where she stood on the sidewalk.

36. During the commission of this assault against the plaintiff, defendant had the three minor children (approximately ages nine and ten) in the car and committed this act of domestic violence with the children.  They were unseat-belted, standing-up in the car, screaming, crying, and trying to protect their mother from the defendant's actions.

37. The defendant was driving one-handed while filming the assault with his left hand - out the driver's side window.

38. All this occurred in the presence of plaintiff's elderly mother, who feared for her daughter's life and for whatever acts of violence the defendant would possibly do next in the deserted parking lot.

39. Further acts of violence by the defendant were only prevented because a Park Police Officer happened to show-up and assist the plaintiff, the children and plaintiff's mother.

40. When the Park Police Officer arrived he had to assist the hysterical children in getting out of defendant's car and attempted to lower the defendant's fever-pitched anger, cautioning him to "stand-down." Defendant was obviously livid and screaming loudly.  It took a while for the defendant assume his suave character and hide his anger.

41. The plaintiff was reasonably put in fear that she would be killed or suffer serious bodily injury.

42. The defendant's actions caused emotional harm to the children, who became hysterical at the scene and needed to be comforted for some time thereafter.

43. The State of Maryland issued a Protective Order in favor of the plaintiff and against the defendant based on this incident of domestic violence.[3]

44. The defendant committed second degree assault in violation of Maryland law and, though this is a civil tort action it should be noted that such an assault violates Federal Law against Interstate Domestic Violence, 18 U.S.C. Section 2261 (a)(1). The plaintiff demands money damages in the AMOUNT of $100,000.00 with respect to this count.

## COUNT TWO:  HARASSMENT

## AND INTERSTATE STALKING

45. The plaintiff adopts and incorporates by reference each and every preceding paragraph as if it were fully set forth here and alleges the following additionally or in the alternative.

46. Over a period of approximately twelve (12) years the defendant intentionally, obsessively and with malicious intent engaged in a course of conduct of harassment against the plaintiff.

47.  This caused the plaintiff substantial emotional distress.

48. Defendant's October 4, 2014 assault of the plaintiff was part of his course of conduct of harassment against the plaintiff.

---

[3] The Protective Order hearing was contested by the defendant, who testified on his own behalf. Criminal charges for the assault and for Violation of the Protective Order were initiated by the State, but at trial, the State decided not to pursue them.

49. The defendant maliciously engaged in a course of conduct, through the use of electronic communications, that alarms or seriously annoys another, with the intent to harass and after receiving a warning to stop and without legal purpose.

50. The defendant's harassment harmed the plaintiff by intentionally intimidating her and causing substantial emotional distress, humiliation, fear, mental anguish, despondency, fear of serious bodily injury, the damage and/or loss of familial relationships, along with economic damages and damage to professional goals.

51. At the outset of their relationship plaintiff trusted the defendant to the point that she revealed her hidden feelings about some of her family members to him.

52. When the relationship deteriorated, the defendant sent plaintiff's private communications to plaintiff's family members and intentionally, purposefully and with malice destroyed her relationship with some of her family members.

53. Defendant sent embarrassing personal communications to people with whom the plaintiff had a professional relationship in order to destroy her well-being, her reputation and to harm her ability to work.

54. During their relationship, defendant took an undetermined number of secret videos of the plaintiff, without her knowledge or consent.  Some of these were intimate and private, including some focused solely on plaintiff's breasts and at least one of plaintiff partially dressed in a bathtub, breast-feeding twins.[4]

55. The defendant surreptitiously showed one or more of these secret-videos to the minor children (then approximately ages five (5) and six (6)) despite the fact that

---

[4] Plaintiff only discovered the fact of these secretly-filmed videos when the defendant attempted to use some of them as evidence in the parties' child custody case.  The plaintiff is under constant fear that the defendant will further humiliate her by publishing others in his trove of secretly-taken videos.

he was under observation and the children were under court protection – *during* a court-ordered supervised visitation session.[5] The children and the plaintiff were significantly harmed by this.

56. The plaintiff is in constant fear that more embarrassing, humiliating videos of her - secretly filmed by the defendant - will be (or have already been) published by the defendant.

57. On many occasions the defendant was notified to cease his harassment of the plaintiff, but he continues.

58. During the first year of litigation the defendant attempted to falsely label the plaintiff as a participant in sexual abuse by the Orthodox Jewish community, falsely asserting that the Jewish community's organized attempt to *protect* its members from any abuse was in fact evidence of its opposite.  Defendant asserted that, because the plaintiff was Orthodox Jewish, she was subjecting the children to sexual abuse.  Defendant sent hundreds of emails to several people in his attempt to falsely label the plaintiff as a sexual abuser based on far-fetched, false assertions.

59. The extent to which the defendant follows and stalks the plaintiff on line is obsessive and encompasses every possible bit of information which the defendant can possible search-out.  He informs the plaintiff of each find to intimidate her and to break her spirit, to make her believe that she will never be able to rid herself of his prying eyes.  Subsequent to finding some bit of plaintiff-based information, the

---

[5] Defendant was able to convince the visitation supervisor to act against her own self-interests by breaking the Court Visitation Center Rules to defendant's benefit and she was then removed and replaced from her position supervising his visitations.

defendant contacts persons related to that information on some pretext; then he informs the plaintiff of his further and extending intrusions into her life.

60. The defendant has disparaged plaintiff and harmed her ability to obtain professional employment; she has suffered past and future damages in loss of income because she cannot accept employment, knowing that defendant will continue to harass her via defamation and by sending private, intimate, communications and videos to her potential employers – as he has done in the past and as he continues to threaten.

61. On July 24, 2014, the defendant filed a pro se Family Law case ostensibly seeking legal custody and visitation rights.

62. Defendant has used the Family Law case as a means to disguise his harassment by seemingly suggesting a legal purpose to his harassment, although there is no legal purpose to defendant's harassment of the plaintiff.  (See U.S. v. Petrovic 701 F.3d 849 (2019) citing Giboney v. Empire Storage & Ice Company 336 U.S. 490, 498, 69 S.Ct. 684.)

63. The defendant uses and abuses the court-system to harass the plaintiff, while giving the false *appearance* of acting under color of law.

64. Defendant files bad-faith, unjustified proceedings in an attempt to cause economic damage to the plaintiff who maintains counsel to defend these proceedings.[6]

65. For the entire approximately six (6) years of defendant's use of the court-system to harass the plaintiff, he has skirted the court Orders, purposefully misinterpreting

---

[6] Defendant herein is Plaintiff in FL #121283 Montgomery County Circuit Court.  Defendant has interfered with plaintiff's right to counsel by harassing each of the four attorneys who have represented the Plaintiff over the years.

them to cause plaintiff to incur attorney fees to straighten-out his falsifications and misconstructions, since the defendant's falsifications and misconstructions are accepted at truth – unless they're challenged.

66. One example from 9/18/2020:  The court order states the time of pick-up on Rosh Hashanah Eve is 4:00 PM and that he must a) notify the plaintiff; b) using only factual information; c) of whether or not he will exercise visitation; d) the notice must  only be on "AppClose;" e) the notice must be within 48 hours of the scheduled visit.   But, instead of complying with the Order, defendant sent numerous communications far in advance and on various platforms stating that he will pick the children up at the wrong time – a time prior to his court-ordered access.   Then he changed his pick-up time to a different wrong time and he sent many messages – to plaintiff and her mother - negating his previous messages on various platforms.   Subsequently, he changed the pick-up time again to a third incorrect time, none of these times were during his court-ordered access time.   He sent demands to the plaintiff regarding the visit.   He falsely asserted that he would take the children to places which are closed due to the pandemic.   Although the court-order specifies precisely how, when and where defendant is to give notice – and prohibits extra communications - he sent a myriad of contradictory notices to the plaintiff.   Not one of his many communications was proper notice under the court-orders.   Yet, the defendant filed knowingly false allegations that the plaintiff violated the visitation Order.

67. The above-stated example is just one of a pattern and practice of trickery that the defendant habitually has used over the course of approximately six (6) years to harass the plaintiff by means of the court-system.

68. The defendant specifically uses the court-system as a means to harass the plaintiff in her observance of Jewish religious restrictions.

69. Defendant regularly attempts to "set-up" the plaintiff; to engineer the facts, and to make it *appear* that the plaintiff has failed to comply with Family Law orders - when in fact the defendant is using court orders for the purpose of harassment, not for obtaining and exercising lawful rights.

70. Through the use of the court-system, the defendant has been granted visitation rights, which he fails to use.

71. Defendant has misused the emergency 911 by making false and/or misleading reports against the plaintiff in order to convince the police to show-up at plaintiff's home to intimidate her.   The defendant has done this primarily at times of Jewish holidays and the plaintiff suffered heightened embarrassment and humiliation when police cars made a presence at her quiet, Orthodox Jewish neighborhood.

72. On August 24, 2020 defendant – calling from the State of New Jersey to the State of Maryland – initiated a false 911 Emergency request that the police go to the home of the plaintiff.  Defendant made this call knowing there was no emergency and no need for an emergency "welfare check."  He engineered false, allegations against the plaintiff with the intent to deceive the police officers, as part of his course of conduct of harassing the plaintiff.

73. Similarly on or about September 18, 2020, defendant purposefully drove from New Jersey to Maryland for the purpose of employing the Montgomery County Police as a harassment tool against the plaintiff. Defendant intentionally misrepresented the facts and the court-ordered requirements to the Montgomery County Police. In addition, he failed to inform the police that he *knew* no visitation would take place that day, because he had not properly noticed the visit and because the plaintiff had not scheduled a visit.[7] The police sent three police cars to plaintiff's home on the Eve of the Jewish holiday of Rosh Hashanah, causing disruption and embarrassment to the Jewish Orthodox neighbors, who were preparing for the holiday.

74. The defendant's act of involving the police in a show-of-force was intended by the defendant to harass the plaintiff by causing harm and disruption to the Jewish Orthodox neighborhood and to the plaintiff and her Jewish Orthodox neighbors who were preparing for the Jewish holiday.

75. The defendant regularly threatens the plaintiff, but "covers his tracks." Rather than make the threat obvious, defendant makes threats which seem innocuous, when viewed in the singular. For instance, instead of threatening with obviously intimidating words, the defendant contrives his threats slyly: He calls some of his threats "gentle reminders." But they are threats, nevertheless, and they hit their intended mark with the same impact as more traditionally-worded threats. Defendant inundates the plaintiff with his so-called "gentle reminders," intimidating her and causing her mental distress.

---

[7] See #66 above.

76. Another example of defendant's type of disguised threats are his seemingly casual mention of various people - out of any context – or within some contrived context. When defendant mentions a name, it has meant that defendant is informing the plaintiff that he has person under surveillance and knows the person's whereabouts and how to reach them.[8]

77. For more than a decade, the defendant has engaged in a non-stop barrage of emails, text messages, Skype messages, AppClose messages – despite plaintiff's requests that he stop his harassment; despite attorney requests to stop contacting her personally; despite a family law court order prohibiting all communications, other than proper notice of visitation.

78. The sheer volume of defendant's messages to the plaintiff – and everybody else he has involved in his harassment course of conduct - is unimaginably large causing intolerable harm and annoyance and fear of the defendant's known anger and violence.  In his program of harassment of the plaintiff, has targeted plaintiff's elderly mother, the three minor children, extended family members, plaintiff's friends and acquaintances, the children's educators, school administrators, Montgomery County officials, physicians, physician and attorney employers and colleagues, a political candidate whom plaintiff supports, all five of plaintiff's previous attorneys, her attorneys' families, the young children of her siblings, Orthodox Jewish rabbis and other persons, who may have some attenuated connection to the plaintiff.  He harasses, doxes, publishes private information and

---

[8] This is frightening, particularly when he mentions the children of plaintiff's siblings and the families of plaintiff's attorneys, as he did on March 13, 2020 in an email to the plaintiff when he ostensibly was discussing corona virus – but actually is informing the plaintiff of his targeting various-named persons.

snoops into these third-party lives - for the purpose of harassing the plaintiff and removing all support from her.

79. The defendant continued to harass the plaintiff during the pendency of a Protective Order.  He wasn't supposed to contact the plaintiff at all.  But he sent a two-inch-thick pile of innocuous-looking emails to the plaintiff and each one constituted the following threat: 'I can do anything I want to you – court order or not - and nobody and nothing will stop me.'

80. On September 10, 2020, over AppClose, defendant threatened that he will not stop using the court to harass the plaintiff – until the Messiah comes.

81. On or about August 14, 2020, defendant contacted Bergen County New Jersey and convinced an employee of Bergen County New Jersey Family Services to directly contact the plaintiff and make demands on her, thereby using this third-party as a means of harassing the plaintiff.

82. The defendant has made the following admissions and assertions:

a) Defendant admitted following one of the minor children on TikTok, without the knowledge of the custodial parent (plaintiff herein).

b) According to the defendant, he found explicit, sexual material that had been posted by the parties' child, who was then then aged 11, on TikTok.

c) *According to the defendant*, the material included the visual depiction of the minor child in behavior which was explicitly sexual, and/or mimicking sexual acts.

82.1 The defendant did, thereafter, knowingly, purposefully and intentionally download and possess the above-mentioned material and did in fact distribute the material - interstate via electronic computer means.

16

82.2 The defendant, thereby possessed and distributed alleged visual depictions of a minor, aged 11, without the consent or knowledge of the sole custodial parent.

82.3 The defendant added or used specific identifying material so that the persons, to whom he distributed the allegedly sexual materials, could easily identify the minor, including his name and where he lives.

82.4 The defendant published the material along with defamatory statements against the plaintiff asserting the material demonstrated the child was not safe in plaintiff's home because of possible sexual abuse.

82.5 The previous paragraphs # 82 – 82.3, describe acts which are proscribed under 18 U.S.C. Section 2252.

82.6  In the alternative, and for the purposes of this tort lawsuit, the previous paragraphs #82 – 82.4 demonstrate the defendant's purposeful misinterpretations and falsification of innocent child-behavior for the sole purpose of defaming and harassing the plaintiff.[9]

83. The defendant has pursued the plaintiff – despite her attempts to shield her address from him, he has located her – and has hired people to follow her.

84. The defendant has acted as a "peeping Tom" surreptitiously looking into the windows of the plaintiff's home and this was discovered when his eye-glasses were found in the well of a downstairs window of plaintiff's home.

85. Defendant instituted a lawsuit as a pro se litigant against plaintiff in a child custody action in 2014 and, though the determination of sole custody in the plaintiff has

---

[9] When Defendant published the above-mentioned depictions of the 11-year-old son, by information and belief, defendant included false and defamatory statements about the plaintiff to the effect that there was reasonable cause to believe the child was being sexually abused in the mother's home, when defendant knew this was false and defamatory.

17

never been disturbed, defendant continues to harm her by means of the lawsuit and is misusing the court system as a tool of harassment against the plaintiff.

86. The defendant files frivolous court filings for the intent and purpose of harassing the plaintiff.

87. Defendant has filed pleadings, which concocted a murder plot against him out of a message he'd received from a third-party who contacted him directly; he blamed the plaintiff (herein) for the alleged murder plot. These pleadings were filed solely for the purpose of harassing the plaintiff via the court-system.

88. Defendant has filed contempt pleadings stating that the plaintiff (herein) failed to comply with court-ordered visitation, although knowingly and intentionally defendant himself failed to perform the condition-precedent of proper notice. These pleadings were filed by the defendant solely for the purpose of harassing the plaintiff via the court-system.

89. Over the course of approximately six (6) years of litigation, the defendant has sent thousands of emails to her attorneys for the purpose of causing the plaintiff to incur needless attorney fees.

90. Because of defendant's harassment and relentless drive to harm the plaintiff, she has not been able to resume a professional career.

91. After her successful professional career in New York, when plaintiff moved to Maryland, (and subsequently) she was offered positions in the fields of lobbying and as senior analyst in think tank, but due to the obsessive harassment by the defendant, the plaintiff was unable to accept these positions, which would have been located at highly-visible politically vulnerable institutions on Capitol Hill;

and the constant threats of reputational attacks by the defendant rendered her acceptance of the positions impossible.

92. In addition to these offers of positions, were it not for defendant's harassment, plaintiff would have been able to seek and obtain positions as Senior Analyst at typical rates of $80,000 per year for small non-profit, to $200,000 for larger.

93. The plaintiff suffered economic damages due to defendant's harassment – over the course of approximately six years - preventing her from obtaining full-time professional employment.

94. Plaintiff has been forced by the defendant's misuse of the court-system to incur attorney fees for approximately six (6) years of defense against his unethical and abusive filings.

95. Defendant has threatened and on many occasions acted upon his threats to contact the professional colleagues of the Plaintiff to smear her reputation.  The latest such threat occurred on August 12, 2020 at which time, the Defendant threatened to email defamatory information about plaintiff to persons affiliated with University of Chicago, whom she uses as her professional references and where she is highly regarded as an accomplished, award-winning, alumnus and where she was serving on the Alumni Board of Admissions

96. WHEREFORE, the plaintiff requests this Honorable Court a) Enjoin the defendant from further harassment of the plaintiff; b) Enter judgment against the defendant and in favor of the plaintiff in the amount of $200,000 in compensatory damages with respect to Count One; c) Enter judgment against the defendant and in favor

of the plaintiff in the amount of $600,000 in compensatory damages with respect to Count Two.

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date:  October 1, 2020

Respectfully Submitted,

_____

Lisa Magnas
3 Saddlerock Court
Silver Spring, MD, 20902
917-513-8398
meshugas2016@gmail.com